**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CHRIS ROLISON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 08-0389-CG-M** |
| | ) | |
| **PETER STERLING, MICHAEL ASFOUR,** | ) | |
| **and P & M BUILDERS, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

This matter is before the court on defendants' motion for summary judgment. (Doc. 16),

plaintiff's response thereto (Doc. 20), defendants' reply (Doc. 22), defendants' motion to strike

(Doc. 21), plaintiff's opposition to the motion to strike (Doc. 23), plaintiff's motion for leave to

amend his complaint (Doc. 24), defendants' opposition to the motion to amend (Doc. 26), and

plaintiff's reply (Doc. 26).  For the reasons stated below, the court finds that defendants' motion

to strike is due to be granted in part and denied in part, that defendants' motion for summary

judgment is due to be granted, and that plaintiff's motion for leave to amend should be denied.

## FACTS

This case arises from a dispute over fees that were allegedly agreed to be paid to plaintiff

for his services regarding a real estate development in Baldwin County, Alabama.  Plaintiff

claims in his complaint that he entered into a contract with defendants to perform services

involving the obtaining of permits and other matters in connection with the purchase and

development of a 97-acre piece of property commonly referred to as "Pilot Town."  In return for

his services, plaintiff alleges that defendants agreed to pay him $800,000.00.

In 2004, Pilot Town was owned by the Langan family of Mobile, Alabama. (Complaint ¶ 8). Defendants, Sterling and Asfour, were looking to invest in real property in Alabama and/or Florida (Asfour Depo. pp. 25-26). Plaintiff, Chris Rolison, was a member of White Sands Group, LLC, which, in May 2004, had offered to purchase five lots in Pilot Town. (Doc. 20, Ex. 8). Sterling and Asfour were each members of defendant, P & M Builders, LLC. (Sterling Depo. p. 25). In 2004, real estate agent, David "Beau" Lutz, introduced Sterling and Asfour to the Pilot Town property. (Sterling Depo. pp. 28-29). Plaintiff was an acquaintance of Lutz who knew the Langans and knew they were interested in selling the property. (Rolison Depo. pp. 90-91). Sterling contacted his neighbor, Steven Cantor, to help finance an offer for the Pilot Town property. (Sterling Depo. p. 73).

Plaintiff and Lutz arranged a meeting between the Langan family, Asfour, Sterling, and Cantor. (Rolison Depo. p. 91). Plaintiff and Lutz were also at the meeting. (Rolison Depo. p. 92). At the meeting, Sterling, Asfour, and Cantor submitted to Thomas J. Langan, Jr. ("Tommy Langan") a written offer to purchase Pilot Town, dated July 1, 2004. (Asfour Depo. p. 35). The purchase price offered was $16.2 million with $100,000.00 of the purchase price to be paid as an earnest money deposit on or before September 30, 2004. (Doc. 17, Ex. D). The offer also stated that "Sellers acting in their own behalf and understand that they will be paying Investors Realty a net fee commission of $1.2 million (one million two hundred thousand dollars)." (Doc. 17, Ex. D). Investors Realty is owned and/or operated by Lutz. An addendum to the purchase agreement, signed by Sterling, Asfour, and Cantor on the same date as the original offer, July 1, 2004, added the following contingencies:

2

1.      contingent on the purchasers obtaining all federal, state and local
         government approvals and permits to build five condominium structures of at
         least 200 feet in height or more.

2.      Contingent on the purchasers obtaining all federal, state and local
         government approvals and permits to build a "full service marina"
         consisting of a minimum of 300 boat slips or mooring slips.

3.      Contingent on the purchasers obtaining all federal, state and local
         government approvals and permits to run and operate a commercial
         business on the marina site as described in the information and maps
         obtained from the seller.

4.      contingent on the purchasers ability of obtaining all federal, state and local
         government approvals and permits to sell retail fossil fuels on the marina
         site as described in the information and maps obtained from the seller.

5.      Contingent upon the full cooperation from the sellers to assist the
         purchasers to their best ability of meeting all of the above contingencies as
         discussed.

6.      A final financing arrangement will be obtained within fourteen days of the
         acceptance of this offer for the purpose of the sellers and purchasers
         accountants come to an agreeable and best suiting payment terms for both
         the sellers and purchasers.

7.      Closing is contingent on sellers and purchasers satisfying all contingencies
         set forth above to occur at the earlier of 90 days from the date of
         acceptance of the the this contract or 30 days from such satisfaction of all
         of the above contingencies.

8.      Contingent on sellers allowing "if needed" and as long as purchasers are
         performing to their best abilities and in the most expeditiously manner to
         meet all contingencies, extra time to be determined at a later date to allow
         purchasers to meet the contingencies.

– [handwritten text:] Continuation of Subdivision Development & Expenses

(Doc. 17, Ex. D).  Cantor tendered a check to Investors Realty for the $100,000.00 earnest

money deposit. (Sterling Depo. p. 99).  On July 8, 2004, Tommy Langan accepted the offer with

an amended Addendum. (Doc. 17, Ex. E).  The new Addendum made a few changes to the

original contingencies, such as stating that the condominium structures would be "200 feet in

height or more but no less than 190 feet in height" and changing the requirement of 300 boat

slips to "300 boat slips but no less than a minimum of 275."   The new Addendum also took out

the handwritten text that had stated "– Continuation of Subdivision Development & Expenses"

and added the following contingencies:

9.   Contingent on the sellers to complete the current building of the road and completion of all utilities.

10.  Sellers to be reimbursed for all developmental expenses that are already planned and occur after the completion of building the road and utilities. Sellers to be reimbursed at cost and without profit. This contingency will only be valid if purchasers have not purchased and closed on the property prior to this time.

11.  Lots numbers 3, 5,10, 11, 15, 21,22,23,24,25,26,27 do not convey. Lot number 28 is not yet determined at this time due to the design of the pool and cabana area.

(Doc. 17, Ex. E).  Defendants accepted these new terms and never sought to renegotiate the price with the Langans. (Sterling Depo. p. 276).  A second Addendum was later created to add five more contingencies:

12.  Purchase price to Seller - $16 million - net brokerage fee of $1.2 million, which shall now be paid by Purchaser.

13.  Deposit increases from $200,000 to $300,000 (to be applied to purchase price) to become "hard" and non-refundable immediately upon receipt of check.

14.  Purchaser is entitled to an automatic 18-month extension from March 1, 2005 for payment of $25,000 per month - to be applied toward the project.

15.  Purchaser is to provide Seller with four two-bedroom condo units and four boat slips free of charge – said boat slips not to exceed 30-foot yacht mooring capacity and ongoing maintenance of condos and boat slips are to be paid by Seller.

16.  To the extent that any provision in said Secondary Addendum conflicts with provisions in the addendum above or above contract, these Secondary Addendum provisions apply.

(Doc. 17, Ex. F).

At some point before the execution of the July 2004 purchase agreement, Lutz approached plaintiff and offered to pay him a percentage of the sales commission if plaintiff could satisfy the contingencies in the purchase agreement. (Rolison Depo. pp. 113, 114).  Lutz signed an agreement stating that Investors Realty would pay plaintiff 40% of the net profits

4

earned from the sale of the property. (Doc. 16, Ex. I).  At the time Lutz and plaintiff agreed to

the 40% term, they did not know how much commission Lutz was to receive. (Rolison Depo. p.

129). Plaintiff is not a real estate agent and is not licensed by the Alabama Real Estate

Commission. (Rolison Depo. pp. 447-448).  Plaintiff understood that his payment was contingent

upon the commission from the sale of the property. (Rolison Depo. pp. 469-470).  Plaintiff

reportedly began working on satisfying the contingencies on the date defendants signed the July

2004 purchase agreement. (Rolison Depo. p. 131).  Plaintiff's company, White Sands Group,

LLC, was to be the primary builder on the portion of the property designated for a residential

subdivision. (Doc. 20, Ex. 1, p. 2).

      Plaintiff states that in July 2004, shortly afer Sterling and Asfour had entered into their

agreement with the Langans, Sterling and Asfour approached plaintiff and offered him

$800,000.00 out of the $1.2 million commission set aside for a real estate commission. (Doc. 20,

Ex. 1, pp. 2-3).  According to plaintiff, the $800,000.00 was to be paid for plaintiff's services in

connection with being the local representative and was no longer in regard to a real estate

commission. (Doc. 20, Ex. 1, p. 3).  Plaintiff signed a handwritten document on P& M Builders,

Inc. letterhead, which stated the following:

> Permits For 5 Towers 200-250 Units Each
> 1000 Units Min.
>
> 350 Town Homes Permites On 7 ACRE Parcel
>    - No Less Than 150.
>
> 300 Boat Slips No Less Than 275
> with Full Blow MARINA GAS -Food-Docks - ETC
>
> All contingenties on Addendum on CONTRACT.
>
>         X _____

Chris Rolison

> Peter Sterling - Steve Cantor - Mike Asfour
> To Investors Realty AND CHRIS Rolison
> 1.2 million or Pro RATA to Completion
> of contingencies listed ABOVE.

(Doc. 17, Ex. J). Plaintiff was the only person that signed the above document. Plaintiff signed

a second document, dated July 22, 2004, which was also signed by Peter Sterling, Michael

Asfour, and David Lutz. It stated the following:

> We peter sterling and Michael As four from p and m builders LLC, who are the
> purchasers of the Ft. Morgan property in Alabama, agree that 1.2million will be
> divided as follows.

> Chris Rolison will be paid the amount of $800,000 or pro-rata to completion of
> contingencies listed on attached prior agreement. Investors Realty will be paid the
> balance of $400,000 for a commission, on the sale of the above property.

(Doc. 17, Ex. K). According to plaintiff, the above two documents reference the same thing.

(Rolison Depo. p. 118). Sterling admits that they entered into an agreement with plaintiff

regarding his services. (Sterling Depo. p. 133). Sterling testified that he agreed that plaintiff

would be paid $800,000 if plaintiff made all the contingencies in the addendums. (Sterling Depo.

p. 169). Plaintiff described his compensation as "a finder's fee," similar to a real estate

commission. (Rolison Depo. pp. 447-448). Plaintiff states that he was to be paid a consulting fee

out of the real estate commission for satisfying the contingencies contained in the contract to

purchase the property. (Rolison Depo. p. 469). According to Sterling, plaintiff is not entitled to

be paid anything unless and until the contingencies had been satisfied. (Sterling Depo. p. 172).

Sterling testified that the second document was drafted and signed because plaintiff wanted to

make sure that he would get his $800,000 he claimed he was owed from Lutz, and he wanted to

make sure he had Lutz's signature. (Sterling Depo. pp. 153, 160). Defendants reportedly

6

understood the second document to be an agreement as to how Lutz or Investors Realty and

Rolison were to split the $1.2 million sales commission they would receive if the contingencies

were satisfied and the subject land sale closed. (Asfour Depo. pp. 195-196).  Defendants report

that none of the contingencies set forth in any of the documents were ever fulfilled by plaintiff or

anyone else.

 Defendants reportedly contemplated various options for the use of the property, including

selling the property to another purchaser or building the project out and that the time for

compliance with the terms of the purchase agreement was extended several times. (Sterling

Depo. p. 92, Asfour Depo. p. 170).  In September 2004, P&M Builders hired Volkert &

Associates to perform certain professional surveying, planning, and engineering services for the

property. (Asfour Depo. pp. 82-83).

 Sterling and P&M Builders also entered into a joint venture agreement with Peter Morris

and others.  The joint venture was conducted "under the name and style PRS."  "The stated

purpose of PRS was, among other things, to 'acquire, hold, improve, develop, sell, lease, or

manage developed or undeveloped properties,' and Pilot Town in particular." (White Sands

Group, L.L.C. v. PRS II, LLC, 998 So.2d 1042, 1047-1048 (Ala. 2008)).  PRS II was

subsequently formed to assume essentially the same functions as PRS and added Tommy Langan

as a member (Id. at 1047; Asfour Depo. p. 107).  According to defendants, Morris and/or his

business, PRM, took over the project and became primarily in charge of the development of the

property. (Asfour Depo. pp. 90, 119, 164).  PRS or PRS II assumed any obligations defendants

had towards the property, including defendants' contract with Vokert & Associates and any

obligations owed to Rolison on behalf of the project. (Sterling Depo. pp. 133-134, 212-213;

Asfour Depo. p. 88).

Peter Morris reportedly negotiated the final closing of the property which did not require the satisfaction of the numerous contingencies outlined in the July 2004 purchase agreement.  On March 1, 2005, Peter Morris and PRS II, reportedly without defendants' knowledge or consent, closed on the property. (Doc. 20, Ex. 14; Asfour Depo. pp. 105-106; Sterling Depo. pp. 144-145).  According to Morris, there is still no direction or final master plan for the Pilot Town project at least partly due to a lawsuit between Gulf Shores,  Baldwin County, and environmentally concerned citizens over zoning planning for the area. (Morris Depo. pp. 125, 291-292, 299-300).

According to plaintiff, Sterling telephoned plaintiff on May 18, 2005, and stated that Sterling and Asfour wanted to offer plaintiff $200,000.00 to $300,000.00 from them personally and that they had asked for Langan to put up $100,000.00 "for working something out with [plaintiff] on the consulting agreement" but Langan had refused. (Rolison Depo. pp. 317-318).

**I. Motion to Strike**

Defendants move to strike certain exhibits submitted by plaintiff in response to the motion for summary judgment.  Defendants object to portions of plaintiff's affidavit, a transcript of a telephone conversation, and two documents containing handwritten notes. (Doc. 20, Exs. 1, 5-7).

First, defendants object to the following portion of plaintiff's affidavit as not based on personal knowledge:

It is my understanding that Tommy Langan then began attending the meetings and being involved where he had not done so in the past.  To the best of my

recollection, in April, 2005, it became known to me that Sterling, Asfour and
Peter Morris' group PRS II had closed upon the Langan property in March, 2005,
apparently waiving the contingencies that I had been working on and changing
their plans for development.  At the time that PRS II closed on the property, the
contingencies that I had been working on were no longer applicable.

(Doc. 20, Ex. 1, p. 5).  After reviewing the above and its use of qualifying phrases such as "it is

my understanding that" and "to the best of my knowledge," the court finds that the passage

should be stricken.  An affidavit, or portions thereof, may be stricken when it runs afoul of the

requirement that summary judgment affidavits be "made on personal knowledge," that they "set

out facts that would be admissible in evidence," and that they "show that the affiant is competent

to testify on the matters stated." FED. R. CIV. P. 56(e)(1).  Statements of speculation or personal

belief are generally not proper and are not considered on summary judgment. See, e.g., Pace v.

Capobianco, 283 F.3d 1275, 1278-79 (11th Cir. 2002) ("an affidavit stating only that the affiant

'believes' a certain fact exists is insufficient to defeat summary judgment by creating a genuine

issue of fact about the existence of that certain fact"); Mize v. Jefferson City Bd. of Educ., 93

F.3d 739, 742 (11th Cir. 1996) ("For factual issues to be considered genuine, they must have a

real basis in the record."); Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999) (explaining that

statements that are conclusory or based on conjecture do not satisfy Rule 56(e)).

        Defendants next object to the following paragraph as contradictory to plaintiff's prior

deposition testimony:

In July, 2004, shortly afer Sterling and Asfour had entered into their agreement
with the Langans, Sterling and Asfour approached me and told me that they had
$1.2 million set aside from the purchase contract with the Langans for a real
estate commission and for someone to be the local contact in Baldwin County.
Initially, Sterling and Asfour indicated that some of the money would be used to
bribe local officials.  When told of this, I flatly refused to have anything to do
with bribing anyone, and I told them that I would withdraw myself and my
company from any involvement in the project.

9

(Doc. 20, Ex. 1, pp. 2-3).  In his prior deposition, plaintiff testified that before the execution of the July 2004 purchase agreement, Lutz approached plaintiff and offered to pay him a percentage of the sales commission if plaintiff could satisfy the contingencies in the purchase agreement.  At his deposition, plaintiff also testified that "there was speculation" that the $1.2 million commission was going to be used to pay politicians or others involved.  Plaintiff said he told Lutz that it was absolutely not his intention to grease any palms and that his connections were with people that he knew and that have respect and confidence in plaintiff's abilities. (Rolison Depo. pp. 125-126).  Plaintiff went on to testify at his deposition that Sterling wanted to know how much money plaintiff was getting out of the commission because Lutz had said he was giving plaintiff more money and that plaintiff was going to be greasing palms with it. (Rolison Depo. pp. 126-127).  Plaintiff testified that Sterling had no knowledge at that time of how much plaintiff would be receiving from the deal. (Rolison Depo. p. 127).  Although in both the deposition testimony and the affidavit, plaintiff denies that he would bribe any officials, the context and reasons for making that statement have changed.  In the affidavit, plaintiff implies that defendants wanted or intended for money to be used to bribe officials, while plaintiff's prior deposition testimony infers that defendants were concerned because they were told that plaintiff planned to bribe officials.  Additionally, plaintiff now states that Sterling and Asfour approached him about paying him a portion of the $1.2 million, when plaintiff's previous testimony indicates that plaintiff and Lutz agreed to split the commission prior to defendants executing the purchase agreement and that he had been involved in the deal since before the execution of the purchase agreement.  The court finds that the statements relating to the money being used to bribe officials are both contradictory and scandalous.  An affidavit may be stricken where material is

"redundant, immaterial, impertinent or scandalous," pursuant to Fed. R. Civ. P. 12(f).[1]  An

affidavit may also be stricken as a sham when it directly contradicts, without explanation, a

witness's previous sworn testimony. See McCormick v. City of Fort Lauderdale, 333 F.3d 1234,

1240 n. 7 (11th Cir. 2003); see also Rollins v. TechSouth, Inc., 833 F.2d 1525, 1530 (11th Cir.

1987) ("[A] party cannot give clear answers to unambiguous questions in a deposition and

thereafter raise an issue of material fact in a contradictory affidavit that fails to explain the

contradiction." (internal quotations and citation omitted)).  When an affidavit is contradictory to

the extent that it is "inherently inconsistent" with deposition testimony, a court should disregard

that affidavit as a sham and exclude it from the evidence considered in a motion for summary

judgment. Rollins, 833 F.2d at 1530; Lane v. Celotex Corp., 782 F.2d 1526, 1531 (11th Cir.

1986).  Thus, the court finds that the last two sentences of the above quoted passage should be

stricken.

　　　　However, the court does not find the first two sentences to be inappropriate. While

plaintiff's prior testimony indicates that plaintiff had agreed to split the proceeds with Lutz prior

to the execution of the purchase contract, that does not necessarily mean that defendants did not

later approach plaintiff to discuss plaintiff's involvement and compensation.  While it is unclear

why defendants would be telling plaintiff that $1.2 million was set aside when plaintiff had been

---

[1] Striking matter on Rule 12(f) grounds is a drastic, disfavored remedy. See, e.g., Sierra Club v. Tri-State Generation and Transmission Ass'n, Inc., 173 F.R.D. 275, 285 (D.Colo. 1997) ("Allegations will not be stricken as immaterial under this rule unless they have no possible bearing on the controversy."); Judicial Watch, Inc. v. U.S. Dept. of Commerce, 224 F.R.D. 261, 263 (D.D.C. 2004) (matter is "scandalous for the purposes of Rule 12(f) when it ... unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court"); Poston v. American President Lines, Ltd., 452 F.Supp. 568, 570 (S.D. Fla. 1978) ("Motions to strike on the grounds of insufficiency, immateriality, irrelevancy and redundancy are not favored").

involved with the deal and entitled to receive a portion of the $1.2 million from the beginning, and it is unclear how or why defendants would decrease the money Lutz was to receive, looking at the statements in the light most favorable to the non-movant, the court finds they are not contradictory.  Such apparent irregularities go to the weight of the evidence and do not indicate inherent contradictions.

Defendants also object to as contradictory plaintiff's affidavit statements that "Sterling and Asfour suggested and set the [$800,000.00] price, and there was no negotiation involved on [plaintiff's] part. [Plaintiff] agreed to the proposal by Sterling and Asfour." (Doc. 20, Ex. 1, p. 3) However, the court does not find these statements to be inherently contradictory to the prior testimony pointed to by defendants.  While plaintiff's prior testimony indicates that plaintiff's agreement to split the proceeds was with Lutz, the initial amount plaintiff had agreed upon was 40% of the commission.  Plaintiff's affidavit testimony indicates that it was after the purchase agreement had been executed that Sterling and Asfour suggested the $800,000.00 price. It is not completely clear why Lutz, Sterling, and Asfour changed the division of the $1.2 million commission between Lutz and plaintiff, but the court finds that the statements are not inherently contradictory.

Defendants object to plaintiff's affidavit statement that "The $800,000.00 was to be paid for [plaintiff's] services in connection with being the local representative and was not in regard to a real estate commission." (Doc. 20, Ex. 1, p. 3).  Plaintiff previously testified that plaintiff understood that his payment was contingent upon the commission from the sale of the property. (Rolison Depo. pp. 469-470).  Plaintiff described his compensation as "a finder's fee," similar to a real estate commission. (Rolison Depo. pp. 447-448).  Plaintiff stated that he was to be paid a

12

consulting fee out of the real estate commission for satisfying the contingencies contained in the contract to purchase the property. (Rolison Depo. p. 469).  It is unclear from the testimony submitted whether plaintiff was referring in his deposition to only the initial 40% share Lutz had agreed to pay plaintiff, or if the statements also pertain to the $800,000.00 plaintiff contends he is entitled to receive.  If plaintiff's prior statements only refer to the initial 40% share, then the affidavit statement is not inherently contradictory.   The fact that plaintiff admitted that the 40% Lutz had initially agreed to pay plaintiff was contingent on the commission from the sale of the property, does not necessarily mean that the $800,000.00 amount plaintiff contends defendants later agreed to pay him was also contingent on the sale. Thus, the court finds that defendants have not shown that this affidavit statement should be stricken.

Next, defendants object to plaintiff's Exhibit 5 which purports to be plaintiff's handwritten notes from a telephone conversation he claims to have had with Sterling. Defendants contend that the notes are unauthenticated.  Plaintiff responds that they were authenticated by his deposition testimony.  To be considered in support of or in opposition to a motion for summary judgment, a document must be authenticated, either by an affidavit that meets the requirements of FED. R. CIV. P. 56(e) or in accordance with the Federal Rules of Evidence. Williams v. Eckerd Family Youth Alternative, 908 F.Supp. 908, 911 (M.D. Fla. 1995) (citations omitted).  Federal Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." FED. R. EVID. 901(a).  The court notes that the deposition testimony to which plaintiff points was not previously submitted to the court and, thus, when the document was submitted, there was no

sworn testimony before the court to identify or authenticate the document.  However, since

plaintiff submitted the authenticating testimony with his response to the motion to strike,[2] the

court finds that they have now been authenticated.  However, authenticated or not, there is still

an evidentiary problem with the notes.  They clearly constitute hearsay, in that they constitute a

statement of the plaintiff, other than one made by the plaintiff while testifying at the trial or

hearing, offered in evidence to prove the truth of the matter asserted.  See FED. R. EVID. 801(c).

These notes are offered by the plaintiff to as evidence that what they say supports his affidavit

testimony concerning what he asserts Sterling told him in the phone conversation at issue.  They

are thus not admissible unless they fall within an exception to the Hearsay Rule. The only

exception that fits would be if they fall under the purview of FED. R. EVID. 803(5), which

concerns the exception to the Hearsay Rule known as "Recorded Recollection".  That Rule says:

> (5) Recorded recollection. A memorandum or record concerning a matter about
> which a witness once had knowledge but now has insufficient recollection to
> enable the witness to testify fully and accurately, shown to have been made or
> adopted by the witness when the matter was fresh in the witness' memory and to
> reflect that knowledge correctly. If admitted, the memorandum or record may be
> read into evidence but may not itself be received as an exhibit unless offered by
> an adverse party.

Here, there is not showing that plaintiff's memory concerning the conversation at issue is

---

[2] (Doc. 23, Rolison Depo. pp. 315-331).  In his testimony, plaintiff admits that he does not know what some of the notations mean.  However, plaintiff does testify as to the meaning of a portion of the notes.  After reviewing the document, the court finds it adds little if any discernable admissible evidence beyond what Rolison testified to during his deposition.  Rolison stated during his deposition that Sterling called plaintiff on the telephone and told plaintiff Sterling and Asfour wanted to offer plaintiff $200,000.00 to $300,000.00 from them personally and they asked for Langan to put up $100,000.00 "for working something out with [plaintiff] on the consulting agreement" but Langan had refused. (Rolison Depo. pp. 317-318).  Plaintiff contends that this evidence is excepted from the hearsay rule as a statement against interest. See FED. R. CIV. P. 804(b)(3).  However, plaintiff misconstrues the nature of the evidence being objected to - which are his notes, and not the statement of Sterling.

insufficient for full and accurate testimony.  Moreover, the exhibit was not offered by an adverse party.  As such is excluded and is not considered by the court in ruling on the motion for summary judgment.

Defendants also object to plaintiff's Exhibits 6 as unauthenticated.  Exhibit 6 purports to be a transcript of a telephone conversation between Sterling and plaintiff's counsel after this case was filed.   Plaintiff contends that there was nothing improper about plaintiff's counsel's conversation or the recording of the conversation.  However, even if the transcript could be appropriate, and assuming there would be no other impediments to its admissibility, plaintiff has not authenticated the transcript by submitting an affidavit or other evidence sufficient to support a finding that the document is what plaintiff claims it to be.  Therefore, Exhibit 6 is stricken and will not be considered by this court on summary judgment.

Lastly, defendants object to Exhibit 7 which is a document containing handwritten notes.  Plaintiff points out that the deposition testimony of Craig Knight authenticates the document.  The court finds that Knight's testimony does identify certain notes he took during a meeting on the date reflected on the document of February 24, 2005. (Knight Depo. p. 70-71).  A review of Exhibit 7 reveals that it is dated February 24, 2005, and contains the notes Mr. Knight testified about.  Mr. Knight confirmed that the notes state the following:

> Chris Rolison met through Beau lead to Tommy Langan.  Has rights to buy 4 to 6 lots off water.  Pays $800K of Beau's $1.2 million and pay to Chris R.

> Partners have to decide how or if to use Chris Rolison.

(Knight Depo. p. 70, 75).  Mr. Knight further testified that he took the notes at a status meeting at Hart Howerton's office in New York at which Knight, Asfour, LP (he does not know who LP is) and Jim Tinson of Hart Howerton were present. (Knight Depo. pp. 70-71).  From what he can

recall, the note quoted above was from a meeting between Knight and Asfour, after the formal meeting with everyone else took place. (Knight Depo. p. 71). Thus, Knight believes the information for the above quoted note came from Asfour. (Knight Depo. p. 71). However, Knight did not know why the information came up and states that there was no explanation regarding the information and Knight had no understanding of who made the deal or who was obligated to pay plaintiff. (Knight Depo. pp. 71-72). The rest of the handwritten notations are not described or explained.

The court finds that even if the document was sufficiently authenticated, it, like the handwritten note of Rolison discussed above, constitutes hearsay, and is likewise not subject to one of the Rule's exceptions. Accordingly, it is stricken and will not be considered.

## II. Summary Judgment Motion

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted: "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, at 249-250. (internal citations

16

omitted).

The basic issue before the Court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir.1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir.1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but .... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e) "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, there is no genuine issue for trial." <u>Matsushita Elec. Indus. Co., Ltd. v.</u>
<u>Zenith Radio Corp.</u>, 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

### B. Breach of Contract Claim

Under Alabama law, "[t]o establish a breach-of-contract claim, a plaintiff must show (1)
the existence of a valid contract binding the parties in the action, (2) his own performance under
the contract, (3) the defendant's nonperformance and (4) damages." <u>Jones v. Alfa Mut. Ins. Co.</u>,
875 So.2d 1189, 1195 (Ala. 2003) (citation omitted).  Defendants contend that there was no valid
contract between the parties and that plaintiff did not adequately perform under the purported
contract.

Under Alabama law, "[t]he requisite elements of a valid contract include: an offer and an
acceptance, consideration, and mutual assent to terms essential to the formation of a contract."
<u>Barnett Millworks, Inc. v. Guthrie</u>, 974 So.2d 952, 957 (Ala. 2007).  Additionally, as the
Supreme Court of Alabama stated in a related case,  "[t]o be enforceable, the [essential] terms of
a contract must be sufficiently definite and certain, and a contract that leav[es] material portions
open for future agreement is nugatory and void for indefiniteness."  <u>White Sands Group, L.L.C.</u>
<u>v. PRS II, LLC</u>, 998 So.2d 1042, 1051 (Ala. 2008) (internal citations and quotations omitted).
"Even though a manifestation of intention is intended to be understood as an offer, it cannot be
accepted so as to form a contract unless the terms of the contract are reasonably certain." <u>Id.</u>
(quoting 17A Am.Jur.2d Contracts § 183 (2004)).  To be reasonably certain, they must "provide
a basis for determining the existence of a breach and for giving an appropriate remedy." <u>Id.</u>
(quoting 17A Am.Jur.2d Contracts § 183 (2004)).

In the instant case, the court finds that the contract in question was not sufficiently
certain to create a valid binding contract.   The written contract which plaintiff claims is binding
merely stated that defendants agree that 1.2 million will be divided as follows:

> Chris Rolison will be paid the amount of $800,000 or pro-rata to completion of
> contingencies listed on attached prior agreement. Investors Realty will be paid the
> balance of $400,000 for a commission, on the sale of the above property.

(Doc. 17, Ex. K).  The document does not state who will pay plaintiff, or what "pro-rata to completion" means.  While parol evidence might suggest that the money was to be paid from the $1.2 million commission on the sale of the property, plaintiff has denied that his right to the $800,000 has anything to do with the real estate commission. (See Doc. 20, p. 13, n. 9 (citing Rolison's deposition testimony)).  According to plaintiff, although under the original agreement between Lutz and plaintiff, his payment was to be based on the commission from the property, under this second document, his payment was completely separate from the commission.  "The $800,000.00 was to be paid for [plaintiff's] services in connection with being the local representative and was not in regard to a real estate commission." (Doc. 20, Ex. 1, p. 3).[3]  Thus, under plaintiff's rendition of the "agreement", there remains a question as to where the $800,000 was to come from, or rather who was obligated to pay that amount.  Plaintiff contends that Sterling and Asfour are obligated to pay plaintiff for his work.  However, it is undisputed that plaintiff did not complete any of the contingencies. To the extent plaintiff contends he is entitled to a "pro-rata" share, the alleged "contract" does not provide sufficient detail concerning what plaintiff would be entitled to, or how such an amount would be calculated.  There has been no parol evidence offered which suggests that there was any additional agreement regarding what plaintiff might be entitled to on a pro-rata basis.  Thus, the court finds that the contract is not sufficiently definite and certain to be valid and binding.

Even if the contract were sufficiently definite and certain to be valid and binding, the court finds that there is no evidence to support a finding that plaintiff has sufficiently performed

---

[3] The court notes that defendants also contend that there was no consideration for this second "agreement" because plaintiff was already obligated to complete the contingencies under the prior contract and the $1.2 million was already promised to Lutz and plaintiff.  However, looking at the facts in the light most favorable to plaintiff, the court finds that additional consideration from both sides could exist.  The contingencies had changed since plaintiff originally agreed to accept 40% for completing them and plaintiff's compensation was increased to $800,000.  Plaintiff also appears to contend that he was to provide additional services as a day-to-day contact or local representative for the project, although that contention is contrary to the express terms of the document, or is at least not evident from document.

19

under the "contract" to recover for defendants' alleged breach.  Plaintiff did not complete the contingencies he agreed to complete.  Even if it could be argued that plaintiff was entitled to the portion that he completed, there has been no evidence presented that he completed any of the contingencies or that his work provided any appreciable value to the project or towards the successful sale of the property beyond plaintiff's initial assistance towards getting the parties together to enter into the purchase agreement.   Although plaintiff testified that his compensation was analogous to a "finder's fee," as discussed above, any so called finder's fee plaintiff was entitled to arose under the original contract between plaintiff and Lutz, under which plaintiff was to be compensated by Lutz. Under the "contract" which plaintiff claims entitles him to be paid by defendants, the only basis for payment is for completion of contingencies contained in the purchase agreement.  For plaintiff to be entitled to compensation merely as a "finder's fee" would be contrary to the terms of the written contract. See Marriott Int'l, Inc. v. deCelle, 722 So.2d 760, 762 (Ala. 1998) (describing general rule that parol evidence is not admissible to contradict, vary, add to or subtract from terms of written contract, except that such evidence will be allowed to clarify an ambiguous contract).

Plaintiff attaches great importance to the fact that the sale of the property closed and asserts that the contingencies were therefore waived.  However, as discussed above, by plaintiff's own account, his compensation had nothing to do with the sale of the property. Plaintiff is not a party to the contract for sale of the property and whether or not the purchasers waived the contingencies in the purchase contract would not affect any agreement between plaintiff and the defendants to complete the contingencies for a price of $800,000.

### C. Quantum Meruit

Plaintiff claims he performed services for defendants and is entitled to be compensated for the reasonable value of those services.  Under Alabama law, a quantum meruit claim for the reasonable value of services rendered "is merely an open account", and is subject to the three-

year statute of limitations of ALA. CODE § 6-2-37. See White v. Sikes, Kelly, Edwards and Bryant, P. C., 410 So.2d 66, 69 (Ala.Civ.App. 1982) (citations omitted). Under § 6-2-37, the three-year time period begins to run "from the date of the last item of the account or from the time when, by contract or usage, the account is due." ALA. CODE § 6-2-37(1). In the instant case, plaintiff claims he performed services for defendants beginning in July 2004 and that he continued to try and assist with the project through April 2005. Thus, the last item of account was in April 2005.[4] Thus, the three-year statute of limitations would expire on May 1, 2008, at the very latest. This lawsuit was filed on July 7, 2008.

Plaintiff asserts that the statute of limitations was tolled during the time that a related lawsuit was pending before the Supreme Court of Alabama. In the state court lawsuit, plaintiff had filed a counterclaim against defendants which was dismissed without prejudice. See PRS II, LLC v. White Sands Group, LLC, CV-05-923 (Cir. Baldwin Co., Ala.); White Sands Group, L.L.C. v. PRS II, LLC, 998 So.2d 1042, 1051 (Ala. 2008). However, plaintiff cites no authority for tolling the statute of limitations under such circumstances. Moreover, Alabama courts have held that the time during which a prior suit was pending is not to be deducted for the statute of limitations. See, e.g., Griffith v. White, 259 Ala. 379, 381, 66 So.2d 907, 909 (Ala. 1953)("In the absence of statute, a party cannot deduct from the period of the statute of limitations applicable to his case the time consumed by the pendency of an action in which he sought to have the matter adjudicated, but which was dismissed without prejudice as to him" citations omitted); Freer v. Potter, 413 So.2d 1079, 1082 (Ala. 1982) ("There is no statute in Alabama that provides for the tolling of the limitations period by the filing of a suit against an Alabama resident in another state that does not have jurisdiction over that resident. Nor is there a renewal statute allowing for the extension of the statute of limitations upon the dismissal of a suit."). The court

---

[4] The court notes that the sale of the property closed in March 2005 and that plaintiff appears to claim that his compensation was due and owing upon the closing of the property. However, for summary judgment purposes, the court will use the latest date possible to calculate the running of the statute of limitations.

finds that the time period was not tolled and that the statute of limitations expired for plaintiff's quantum meruit claim prior to the filing of this action.  Plaintiff's quantum meruit claim is therefore barred.


**III Motion to Amend**

On May 14, 2009, plaintiff moved to amend his complaint to add a claim for fraud, claiming that defendants falsely represented that they would pay plaintiff $800,000.00 for his services.  The Rule 16(b) scheduling order in this case states that any motion for leave to amend the pleading or to join other parties must be filed on or before November 14, 2008. (Doc 11). District courts are required to "enter a scheduling order that limits the time  ... to amend the pleadings ..." FED. R. CIV. P. 16(b).  Such orders "control the subsequent course of the action unless modified by a subsequent order," FED. R. CIV. P. 16(e), and may be modified only "upon a showing of good cause." FED. R. CIV. P. 16(b).  Had plaintiff sought leave to amend his complaint before the scheduling order deadline, the court would look to Rule 15(a) of the Federal Rules of Civil Procedure to determine whether the amendment should be allowed. While leave to amend under Rule 15(a) may be freely given, leave to amend after a scheduling order deadline will only be given upon a showing of "good cause" under Rule 16(b).  Sosa v. Airprint Systems, Inc., 133 F.3d 1417, 1418 (11th Cir. 1998).  "Otherwise, scheduling order deadlines would be 'meaningless' and the good cause requirement articulated by Rule 16(b) would effectively be read out of the Federal Rules of Civil Procedure."  Anderson v. Board of School Comm'rs of Mobile County, AL, 78 F.Supp.2d 1266,1269 (S.D. Ala. 1999).  This "good cause standard... precludes modification of a scheduling order deadline unless [the schedule] cannot 'be met despite the diligence of the party seeking the extension.'" Id. (citations omitted).

Plaintiff contends that he should be allowed to assert this new claim because he had no reason to know that defendants would claim there was no valid contract until defendants filed their motion for summary judgment.  However, plaintiff claims he was owed the money since the

sale of the property was closed upon in May 2005 and knew he was not being paid what he

believed he was entitled to since he learned of the closing.  The court notes that plaintiff included

a non-contract claim for <u>quantum meruit</u> in his current complaint.  Additionally, in their August

7, 2008, answer to the complaint, defendants denied the plaintiff was owed $800,000 under the

July 22, 2004 "contract" and asserted as a defense that there was no privity of contract, express

or implied, between plaintiff and the defendants. (Doc. 4).  The report of parties planning

meeting, filed September 15, 2008, also includes the statement that "Defendants contend the

document is not a contract..." (Doc. 10, ¶1(b)).  As such, the court finds that plaintiff had reason

to know the defendants were claiming that the contract was not valid in ample time to meet the

scheduling order deadline, but failed to do so.  Plaintiff clearly has not shown good cause for

amending his complaint at this late date.

 Moreover, amendment would be futile, as plaintiff's fraud claim would be barred by the

applicable statute of limitations.  A district court need not grant leave to amend:

> (1) where there has been undue delay, bad faith, dilatory motive, or repeated
> failure to cure deficiencies by amendments previously allowed; (2) where
> allowing amendment would cause undue prejudice to the opposing party; or (3)
> where amendment would be futile. <u>See</u> <u>Foman v. Davis</u>, 371 U.S. 178, 182, 83
> S.Ct. 227, 9 L.Ed.2d 222 (1962).

<u>Bryant v. Dupree</u>, 252 F.3d 1161, 1163 (11th Cir. 2001).  The Eleventh Circuit has found it to be

within the district court's discretion to deny a motion to amend due to futility on the ground that

the statute of limitations has run.  <u>See</u> <u>e.g.</u> <u>Brewer-Giorgio v. Producers Video, Inc.</u>, 216 F.3d

1281, 1284-85 (11th Cir. 2000) (finding no error in the district court's decision that an

amendment would have been futile on statute of limitations grounds); <u>Moore v. Baker</u>, 989 F.2d

1129, 1131 (11th Cir. 1993) (finding an amended complaint to be futile where the new claim

would be clearly barred by the applicable statute of limitations).  In Alabama, the statute of

limitations for fraudulent misrepresentation claims is two years and begins to run on the date

plaintiff discovers, or should have discovered, the fraud and the misrepresentation. <u>Fowler v.</u>

<u>Provident Life and Accident Ins. Co.</u>,  256 F.Supp.2d 1243, 1248 (N.D. Ala. 2003) (citing

ALA.CODE §§ 6-2-3, 6-2-38(l ); and <u>Auto-Owners Ins. Co. v. Abston</u>, 822 So.2d 1187, 1194 (Ala. 2001)).  Plaintiff had reason to know that defendants did not intend to honor the alleged contract more than two years prior to asserting this fraud claim.  Thus, the court finds that plaintiff's fraud claim is barred by the statute of limitations and that plaintiff's proposed amendment would therefore be futile.


<u>**CONCLUSION**</u>

For the reasons stated above, defendants' motion to strike (Doc. 21) is **GRANTED in part** and **DENIED in part** as set out above; defendants' motion for summary judgment (Doc. 16) is **GRANTED**; and plaintiff's motion for leave to amend his complaint (Doc. 24) is **DENIED**.

**DONE and ORDERED** this 13th day of August, 2009.


/s/ Callie V. S. Granade

CHIEF UNITED STATES DISTRICT JUDGE